336 P.3d 727

Michael NAGLIERI, Petitioner,

v.

The INDUSTRIAL COMMISSION
OF ARIZONA, Respondent,

Sun Devil Auto Parts, Inc.,
Respondent Employer,

Wausau Business Ins. Co.,
Respondent Carrier.

No. 1 CA–IC 13–0024.

Court of Appeals of Arizona,
Division 1.

Sept. 30, 2014.

As Amended Sept. 30, 2014.

Taylor & Associates, PLLC By Dennis R. Kurth, Phoenix, Counsel for Petitioner.

Industrial Commission of Arizona By Andrew F. Wade, Phoenix, Counsel for Respondent ICA.

Cross & Lieberman, P.A. By Donald L. Cross, Phoenix, Counsel for Respondents Employer and Carrier.

Presiding Judge RANDALL M. HOWE delivered the opinion of the Court, in which Judge PATRICIA A. OROZCO joined and Judge SAMUEL A. THUMMA dissented.

## OPINION

HOWE, Presiding Judge.

¶ 1 This is a special action review of an Industrial Commission of Arizona ("ICA") award and decision upon review for a noncompensable claim. We set aside the award because the administrative law judge ("ALJ") erred in refusing to schedule an additional hearing to receive evidence alleging that a witness presented fraudulent testimony at the ICA hearing.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Michael Naglieri worked as an automobile mechanic for Sun Devil Auto Parts, Inc. ("Sun Devil") in Fountain Hills, Arizona. Naglieri, a gun collector, had brought his 1919 Browning machine gun to work one day. Because work was slow that afternoon, Naglieri disassembled and cleaned his gun on top of his tool box in the center of the shop. He worked on the gun for about an hour, then the gun's drive rod came unhinged and shot into his right eye. Naglieri applied for workers' compensation benefits for his injuries under the Arizona Workers' Compensation Act ("the Act"), but his claim was denied.

¶ 3 Naglieri timely requested an ICA hearing to contest the denial. He alleged that he was injured in the course of his employment because his supervisors had allowed him to clean his gun at work. He testified at the ICA hearing that several Sun Devil employees witnessed him clean the gun, including store manager Stan Hartsock; assistant store manager Mark Meyer; and fellow employees Jason Grudier, Bob Schiel, and Patrick Quinslan. Naglieri also testified that Hartsock asked Naglieri questions while he cleaned the gun. Although Naglieri could not recall who was present at the time he was injured, he testified that fellow employee Adam Silva immediately came to his aid.

¶ 4 Schiel testified that he was working that day, but did not witness Naglieri's injury. Although Schiel was aware that Naglieri had brought a gun to work, he did not know that Naglieri was working on it. Schiel testified that other employees also had brought guns to work to show their coworkers, but was unaware whether they had ever worked on their guns at the shop. He testified that store supervisor Montgomery Miller had told him that he had previously cleaned his guns at work.

¶ 5 Grudier testified that Naglieri worked on his gun because business was slow that afternoon. Grudier agreed that Naglieri and other employees had brought guns to the shop and confirmed that Naglieri was working on his gun in full view of the others. He stated that other Sun Devil employees—including Hartsock, Meyer, and Silva—approached Naglieri to watch him clean the gun and asked Naglieri questions. Grudier left work before Naglieri was injured.

¶ 6 Hartsock testified that he was unaware that Naglieri had a gun at work until after his injury, when Silva came into the front office saying, "Call 911." Hartsock stated that when business was slow, employees were supposed to "clean the shop, put away inventory, or go home." He acknowledged that employees were allowed to work on their

personal vehicles if they were off the clock, an invoice was written, and they paid for parts.

¶ 7 Hartsock also testified that he was unaware that employees had brought guns to work and that employees had never asked permission to do so. He said that if he had seen an employee cleaning a gun, he would have told the employee to stop and sent the employee home. Hartsock admitted that Naglieri returned to work after his injury and was not disciplined for bringing the gun to work. He also admitted that he was unaware of any rule prohibiting employees from bringing guns to Sun Devil.

¶ 8 Miller, Hartsock's supervisor, also testified. He supervised eight Sun Devil stores, including the Fountain Hills store where Naglieri worked. He stated that Sun Devil did not have a policy prohibiting employees from bringing guns to work, but employees would not be permitted to work on guns at the store without permission. Miller testified that employees "on the clock" had to engage in activities that benefited Sun Devil.

¶ 9 The ALJ found that Naglieri's claim was noncompensable. The ALJ found, in pertinent part:

Upon a review of the totality of the evidence, it is determined that [Naglieri] and Jason Grudier were not credible. I do not believe that employees were allowed to work on guns at the workplace where the business was auto mechanics, or that supervisors and other employees watched [Naglieri] work on the gun while he was on the clock and did not tell him to stop. Any conflicts in the evidence or inferences to be drawn therefrom which may exist are resolved against [Naglieri].

¶ 10 Naglieri timely requested administrative review of the ALJ's decision and moved for an additional evidentiary hearing. In his motion, Naglieri attached an affidavit from Meyer stating that Hartsock had told Meyer that he had not been truthful at the ICA hearing:

I Mark Meyer am the Assistant Manager and Service Assistant at Sun Devil Automotive.

I am writing to the Industrial Commission on behalf of Michael Naglieri and to tell you the truth about the events that happened on July 18, 2012, when Michael Naglieri had an accident at Sun Devil Auto and lost his right eye. Since I witnessed Michael working on the gun and was aware of it, I must clear my conscience and come forward to tell the truth.

Stan Hartsock was the Manager on Duty and he has admitted to me that he was not truthful at the Industrial Commission hearing for Michael Naglieri on December 5, 2012.

I Mark Meyer saw with my own eyes and admittedly know that Michael Naglieri working [sic] on his 1911 [sic] gun in the bay in the afternoon of July 18, 2012. Stan and myself knew what was taking place in the facility at 13226 N. La Montana Drive, Fountain Hills.

It is hard not to see all of the bays because it is one large area. I spoke to Michael and asked questions about this WWII collectors [sic] gun. Everyone that [sic] was on duty was aware that Michael was cleaning this gun. We are slow in the summer and it is not an uncommon practice for employees to bring in side projects and personal work during the slow time. I swear this testimony to be true and will testify in court to what I witnessed.

After considering the motion, the affidavit, and Sun Devil's opposition, the ALJ affirmed her finding that Naglieri's injury was noncompensable and declined to schedule an additional evidentiary hearing. Naglieri timely petitioned for special action review.

## DISCUSSION

¶ 11 Naglieri argues that the ALJ abused her discretion by not scheduling an additional hearing to allow him to present evidence that Hartsock had testified falsely at the ICA hearing about whether he was aware that Naglieri was cleaning his gun at the store. The issue whether Hartsock was aware of Naglieri's activity was critical: "[A]n employee is entitled to compensation when he sustains his injury during a reasonable and anticipated use of the employer's premises.... [W]here the employees' acts

are performed with the implied consent of the employer, injuries sustained therefrom are in the course of employment."[1] *Finnegan v. Indus. Comm'n,* 157 Ariz. 108, 111, 755 P.2d 413, 416 (1988) (citation omitted). We review a denial of a request for an additional hearing to present evidence of fraud for an abuse of discretion. *Southwest Nurseries v. Indus. Comm'n,* 133 Ariz. 171, 173, 650 P.2d 473, 475 (App.1982). "An abuse of discretion occurs where the court's reasons for its actions are clearly untenable, legally incorrect, or amount to a denial of justice." *Bowen Prod., Inc. v. French,* 231 Ariz. 424, 427 ¶ 9, 296 P.3d 87, 90 (App.2013) (internal quotation marks and citation omitted).

¶ 12 Arizona Administrative Code Rule R20–5–156 establishes a flexible procedure for requesting and granting a continuance of an ICA hearing if a party seeks to introduce additional evidence. *Wood v. Indus. Comm'n,* 126 Ariz. 259, 261–62, 614 P.2d 340, 342–43 (App.1980). A party's request must state "the nature and substance" of the additional evidence, the names and addresses of the witnesses, and the reason the party is unable to introduce the evidence or witness at the original hearing. A.A.C. R20–5–156(B). The party must make the request at the conclusion of the original hearing. *Id.; Wood,* 126 Ariz. at 261, 614 P.2d at 342. Continuances are permitted so that substantial justice will be achieved and all of the facts of the case can be fully considered. *Wood,* 126 Ariz. at 261, 614 P.2d at 342 (citation omitted). The ALJ has discretion whether to grant or deny the continuance, *id.,* and may deny it if "with the exercise of due diligence, the evidence or testimony could have been produced or the evidence or testimony would be cumulative, immaterial, or unnecessary," A.A.C. R20–5–156(C).

¶ 13 Naglieri did not request a continuance at the conclusion of the initial ICA hearing, however. Instead, he requested an additional hearing as part of his request for review of the ALJ's award under A.R.S. § 23–942(D). Although this delay ordinarily would be sufficient reason to deny an additional hearing, such delays are excused when a party alleges that the ALJ has received fraudulent evidence at the hearing. *Southwest Nurseries,* 133 Ariz. at 174, 650 P.2d at 476 (noting that compliance with the time limit of Rule R20–5–156 is unnecessary in cases of fraudulent evidence). Naglieri alleged in his request for review that he had evidence—in the form of Meyer's affidavit—that Hartsock had told Meyer that he "was not truthful at the [ICA] hearing" and that Hartsock knew "what was taking place" at the store. Lying about a material matter affecting whether an injury is compensable under the workers' compensation statutes constitutes fraud. *See id.* at 173, 650 P.2d at 475 (providing that claimant's lying about his injury constituted fraud). The ICA has the authority to address issues of fraud at any time. *See id.* at 173–74, 650 P.2d at 475–76 ("[N]o statute of limitations or rule of law ... prevents the [ICA] from upsetting a former finding [of compensability] when such a finding was procured by fraud.... [The ICA may also] grant relief when fraud is uncovered before the disposition becomes final."). Thus, the delay in formally requesting an additional hearing did not preclude the ALJ from ordering the hearing.

¶ 14 Naglieri's request for an additional hearing also met the other requirements of Rule R20–5–156(B). Naglieri attached to the request for review Meyer's affidavit, which explained the "nature and substance" of the additional evidence and provided Meyer's name, work address, and title. The request also explained the reason Naglieri did not call Meyer to testify at the hearing: Naglieri was not aware of the need to call Meyer to impeach Hartsock's testimony until after

---

1. This rule may apply to acts—such as Naglieri's—that have little or no connection to an employee's job duties. Thus, if the employer has permitted the act, an injury may be compensable even when the employee "is engaged in an act for his own individual benefit wholly apart from his job and in no way incidental to it[.]" *Goodyear Aircraft Corp. v. Gilbert,* 65 Ariz. 379, 383, 181 P.2d 624, 626 (1947); *see, e.g., id.* (employee's injury from an ammunition shell that exploded while he was fabricating it into a souvenir compensable); *Jayo v. Indus. Comm'n,* 181 Ariz. 267, 271, 889 P.2d 625, 629 (App.1995) (employee's injury from playing "hacky sac" during work lull compensable); *Stephenson v. Indus. Comm'n,* 23 Ariz.App. 424, 426–27, 533 P.2d 1161, 1163–64 (1975) (employee's injury from playing "catch" during lunch break compensable).

Hartsock had testified, and Meyer did not "step forward" to help Naglieri until after the hearing. Moreover, Meyer's information that Hartsock had told him that he "was not truthful at the [ICA] hearing" did not exist until after the hearing had ended.

¶ 15 The affidavit showed that Naglieri had additional evidence material to whether his injury was compensable. Meyer alleged that Hartsock told Meyer that "he was not truthful at the [ICA] hearing." Meyer also averred that he and Hartsock "knew what was taking place" at the store and that "[e]very one [who] was on duty was aware that [Naglieri] was cleaning his gun." Meyer further noted that at the store "[i]t is hard not to see all the bays because it is one large area" and that "it is not an uncommon practice for employees to bring in side projects and personal work during the slow time." Meyer's affidavit not only provided evidence that Hartsock admitted to not testifying truthfully at the hearing, but also that Hartsock's testimony was not truthful.

¶ 16 Hartsock's credibility was dispositive because his testimony directly contradicted Naglieri's testimony. Naglieri testified that Hartsock talked with him while he was cleaning his gun, but Hartsock testified that he did not know that Naglieri was cleaning a gun until the accident occurred and that he would have sent home an employee whom he knew had brought a gun to work. The ALJ weighed the credibility of Hartsock's and Naglieri's testimony and found that Naglieri's was not credible. That calculation might have been different had the ALJ heard additional evidence about whether Hartsock admitted testifying untruthfully at the hearing.

¶ 17 The dissent believes Meyer's affidavit does not present sufficient evidence of fraud because it does not "state 'specifically and in detail'" the nature and substance of the additional evidence. *See infra* ¶ 39. The dissent acknowledges that Meyer's affidavit states that "Stan Hartsock was the Manager on Duty and he has admitted to me that he was not truthful at the [ICA] hearing for Michael Naglieri on December 5, 2012," but claims that this sentence does not explain what Hartsock admitted he was untruthful about

or how any untruth was material to the case. The dissent, however, considers this sentence only in isolation and ignores the rest of the affidavit. The rest of the affidavit explains that Meyer saw "with his own eyes" that Naglieri was working on his gun at his bay, that "Stan and myself knew what was taking place at the facility," that "[i]t is hard not to see all of the bays because it is one large area," and that "bring[ing] in side projects and personal work during the slow time" was not an "uncommon practice." The rest of the affidavit makes pellucid that the subject of Hartsock's admission of untruthfulness was whether Hartsock was aware that Naglieri was working on his gun when he was injured.

¶ 18 Moreover, nothing in the record shows that the parties or the ALJ were in the dark about the substantive meaning of Meyer's affidavit. In the request for additional hearing, Naglieri's counsel argued that "the narrow issue in this case" was whether Naglieri testified truthfully about whether Hartsock knew he was cleaning his gun and failed to stop him, and offered Meyer's affidavit as evidence that Hartsock's testimony was fraudulent. Sun Devil certainly opposed the request for an additional hearing, but it never claimed that it could not determine the subject of Hartsock's alleged untruthfulness. The ALJ likewise could not have been unclear about the affidavit's significance. She understood that the only issue in dispute was whether Naglieri or Hartsock was telling the truth about Hartsock's knowledge of the gun, and she would have read the affidavit with that understanding. The "substance and nature" of the proffered evidence was obvious.

¶ 19 Because the affidavit demonstrated that Naglieri had material evidence that the ALJ had received fraudulent evidence at the hearing, the ALJ abused her discretion in denying the request for an additional hearing. Although ICA hearings are adversarial "in a sense," their purpose "really remains the humanitarian and compassionate one of aiding and compensating the injured worker." *Gordon v. Indus. Comm'n*, 23 Ariz.App. 457, 460, 533 P.2d 1194, 1197 (1975). A claimant has the right to present witnesses and to cross-examine adverse witnesses, *Pauley v. Indus. Comm'n*, 10 Ariz.

App. 315, 317, 458 P.2d 519, 521 (1969), and an award based on fraudulent evidence can be voided at any time, *Southwest Nurseries*, 133 Ariz. at 173–74, 650 P.2d at 475–76. Because the ALJ's decision rested on determining whether Naglieri or Hartsock was telling the truth, the ALJ should have granted an additional hearing to consider evidence that Hartsock had given fraudulent testimony at the original hearing.[2] *Cf. Gordon*, 23 Ariz. App. at 460–61, 533 P.2d at 1197–98 ("[R]eversible error is more likely to occur by the exclusion of admissible evidence than the inclusion of incompetent evidence. The [ICA] cannot be presumed to have reached the right result if it erroneously excluded on technical grounds some important piece of evidence which might have swayed the result.").

¶ 20 This case is much like *Southwest Nurseries*. In that case, a worker filed a claim for an industrially-related back injury. *Southwest Nurseries*, 133 Ariz. at 172, 650 P.2d at 474. At the hearing, the claimant denied any history of back injuries. *Id.* After the hearing judge found the claimant's injury compensable, the carrier requested review of the award, alleging that the claimant had lied about prior back injuries. *Id.* at 173, 650 P.2d at 475. The carrier submitted an affidavit from counsel stating that the claimant's girlfriend had admitted that the claimant had lied about his history of back injuries and had provided the names of his former treating doctors. *Id.* The carrier also submitted medical records from those doctors. *Id.* The ALJ refused to schedule an additional hearing to investigate the fraud allegation and affirmed the award. *Id.* This Court held on appeal that the ALJ erred in denying an additional hearing, "[i]n light of the overwhelming evidence of fraud." *Id.*

¶ 21 Sun Devil argues, however, that this case is not like *Southwest Nurseries* because the evidence of fraud is not "overwhelming." Sun Devil maintains that the employer in *Southwest Nurseries* submitted corroborating evidence that the claimant had lied, and Naglieri submitted nothing that corroborates Meyer's allegations. Sun Devil further maintains that the girlfriend's statements in *Southwest Nurseries* that revealed the lying were entitled to great weight because she had been a witness at the original hearing, and her admission that she and the claimant had lied during their testimony was against her interest; Meyer's allegation that Hartsock had not testified truthfully, in contrast, is not entitled to weight because Meyer did not testify at the original hearing and his affidavit was not against his own interest.

¶ 22 Sun Devil's distinctions are not well taken, however. Initially, Sun Devil's argument that only "overwhelming" evidence of fraud justifies an additional hearing misconstrues *Southwest Nurseries*. Although this Court indeed found in *Southwest Nurseries* that the evidence of fraud was "overwhelming," 133 Ariz. at 173, 650 P.2d at 475, this Court did not hold that the evidence of fraud *must* be overwhelming to justify a hearing. In holding that the ALJ should have held an additional hearing, this Court recognized that the Arizona Supreme Court had held in an earlier decision that "no statute of limitations or rule of law" prevents the ICA from overturning a compensability ruling "when such a finding is procured by fraud." *Id.* (citing *Scott v. Wasielewski*, 89 Ariz. 29, 32, 357 P.2d 614, 616 (1960)). Thus, the only quantum of proof necessary to justify an additional hearing is evidence that the compensability finding was "procured by fraud." Meyer's affidavit that Hartsock admitted that he was not truthful at the hearing was evidence that the ALJ's ruling was procured by fraud.

---

**2.** The dissent contends that the Majority concludes that "the ALJ lacked the discretion to deny Naglieri's request for an additional hearing." *See infra* ¶ 36. With respect, this statement is incorrect. Whether the ALJ should have conducted an additional hearing is always within the ALJ's discretion. *Southwest Nurseries*, 133 Ariz. at 173, 650 P.2d at 475. But discretion is abused when the ALJ's reasons for denying a hearing are "clearly untenable" or "amount to a denial of justice." *Bowen Prod., Inc.*, 231 Ariz. at 427 ¶ 9, 296 P.3d at 90. Naglieri made a procedurally proper request for an additional hearing and presented evidence that the critical witness against him admitted testifying untruthfully at the hearing. Because the acceptance or denial of his claim depended solely on weighing the credibility of the witnesses, the ALJ's denial of an additional hearing in these circumstances was clearly untenable and a denial of justice.

¶ 23 Moreover, the factual differences between this case and *Southwest Nurseries* are not meaningful. First, the issue in *Southwest Nurseries* was whether the claimant had prior back injuries, and medical records of the claimant's prior back injuries indeed existed to corroborate the girlfriend's allegation that the claimant had lied about having no prior back injuries. The issue in this case, however, was whether the manager of the Fountain Hills Sun Devil Auto—Hartsock—knew that Naglieri was working on his gun in the shop and consented to that activity. Nothing comparable to medical records exists to corroborate Meyer's allegation that Hartsock admitted testifying untruthfully that he did not know about—and would not have consented to—Naglieri's activity, and nothing in *Southwest Nurseries* requires such corroboration.

¶ 24 Second, although Meyer did not testify at Naglieri's original hearing, this does not diminish the weight of his allegation. Nothing in *Southwest Nurseries* indicates that an allegation of fraud in an ICA hearing must be against the interest of the alleging person. Moreover, the circumstances of Meyer's allegation support its credibility. Meyer's allegation put his boss in a very bad light, which—to state it mildly—would create an unfortunate strain in their working relationship. Contrary to Sun Devil's arguments, this case is not distinguishable from *Southwest Nurseries*.

¶ 25 Sun Devil and the dissent analogize this case to *Mother Tucker's Food Experience v. Industrial Commission*, 142 Ariz. 496, 690 P.2d 797 (App.1984), but the analogy does not hold true. In that case, a claimant was awarded compensation for a workplace injury, and the employer requested review and an additional hearing, arguing that after the hearing it had obtained the time cards of the claimant's coworkers that showed "material discrepancies" in the coworkers' testimony. *Id.* at 499, 690 P.2d at 800. The ALJ summarily affirmed the award without addressing the request for an additional hearing. *Id.* The employer then sought special action review in this Court, arguing for the first time that the time cards showed perjury

and fraud, entitling it to an additional hearing. *Id.*

¶ 26 This Court affirmed the ALJ's ruling for several reasons. The Court found that the employer's request for an additional hearing was untimely because the employer did not make it at the conclusion of the original hearing, as Rule R20–5–156 requires. *Id.* at 498–99, 690 P.2d at 799–800. The employer "waited over two months after the close of the hearing and over a month after the adverse award" to file its request. *Id.* at 500, 690 P.2d at 801. The fraudulent evidence exception to the timeliness requirement did not apply because although the request cited *Southwest Nurseries*, "[t]here is *no* allegation of perjury or fraud in the request, affidavit or memorandum." *Id.* at 499, 690 P.2d at 800. The Court also found that the request did not satisfy the substantive requirements of Rule R20–5–156: it did not state the nature and substance of the time cards, the name and address of the employer's representative who would testify about the time cards, or the reason that the employer was unable to produce them at the hearing. *Id.* at 500, 690 P.2d at 801. The Court further found that the employer had not shown due diligence in obtaining the time cards justifying their late presentation because the time cards "presumably were always in petitioner employer's possession and control." *Id.* at 499, 690 P.2d at 800.

¶ 27 Apart from the inadequacy of the request, this Court also rejected the employer's claim that the time cards showed "overwhelming" evidence of fraud because no witness had confessed to perjury and the affidavit averred only that the employer had found evidence that would show "discrepancies" in the witnesses' testimony. *Id.* at 500, 690 P.2d at 801. This Court noted that it was uncertain "whether the touted 'evidence' applie[d] to one or both of the coworkers ... [and] what the alleged discrepancy is between the time cards and the testimony and what this ultimately implies." *Id.* The request for additional hearing not only failed to state " 'overwhelming evidence of fraud,' it states no evidence of fraud whatsoever but is merely conclusory and relates to purported impeachment evidence."

*Id.* at 501, 690 P.2d at 802. This Court concluded that the ALJ was "fully justified" in denying the request for an additional hearing "given the blatant insufficiency of the request." *Id.*

¶ 28 None of the "blatant insufficiencies" of the request for an additional hearing in *Mother Tucker's* exist here. Although Naglieri did not make his request at the close of the ICA hearing, he explicitly alleged that the ALJ had received fraudulent testimony from Hartsock and supported his allegation with Meyer's affidavit, which brought the request within the *Southwest Nurseries* exception. The request otherwise satisfied the requirements of Rule R20–5–156. It also explained that Naglieri could not have presented evidence of fraud at the ICA hearing with due diligence because Hartsock's admission that he did not testify truthfully at the ICA hearing could have occurred only after the hearing had concluded.

¶ 29 Moreover, unlike the allegations in *Mother Tucker's* that the additional evidence revealed mere "discrepancies" in the witnesses' testimony, the affidavit here alleged that a critical witness admitted to testifying untruthfully at the ICA hearing and that the witness's testimony was in fact untrue about an issue that determined whether Naglieri's injury was compensable. The differences between this case and *Mother Tucker's* are so stark that *Mother Tucker's* provides little guidance in resolving this case.

¶ 30 Meyer's affidavit presented sufficient evidence that the ALJ considered fraudulent evidence in making its award. The ALJ therefore abused her discretion in denying Naglieri's request for an additional hearing.

## CONCLUSION

¶ 31 For these reasons, we set aside the award.

THUMMA, Judge, dissenting.

¶ 32 The Majority correctly states the administrative law judge (ALJ) had the discretion to grant Claimant Michael Naglieri's request for an additional evidentiary hearing. Given the record and the deferential standard of review, however, I do not agree with the Majority's conclusion that the ALJ lacked the discretion to deny Naglieri's request for an additional evidentiary hearing. Accordingly, because the ALJ did not abuse her discretion, I would affirm, and because I would affirm, I respectfully dissent.

¶ 33 Mark Meyer's affidavit, with the exception of a single sentence discussed below, describes information that Meyer purportedly saw or knew on July 18, 2012 when Naglieri was seriously injured. This information is consistent with some of the conflicting testimony received by the ALJ at the December 5, 2012 hearing, where Naglieri testified that Meyer was at the store on July 18, 2012. Although Naglieri was represented by counsel, he did not seek to depose Meyer, did not subpoena Meyer and did not call Meyer as a witness at that hearing, even though he had the ability to do so. *See* Arizona Administrative Code (A.A.C.) R20–5–141(A); – 142(A); –135(B)(3). Naglieri has not attempted to show that, "with the exercise of due diligence," he was unable to present this information at the hearing. *See* A.A.C. R20–5–156(C) (ALJ "may deny" request to introduce additional evidence or testimony made "at the conclusion of a hearing" if the ALJ "determines that, with the exercise of due diligence, the evidence or testimony could have been produced" at the hearing). Accordingly, given the discretion granted to an ALJ, the ALJ here did not abuse her discretion in denying Naglieri's request for an additional hearing based on this portion of the Meyer affidavit.

¶ 34 The remaining issue is whether the ALJ was required, as the Majority finds, to grant Naglieri's request for an additional hearing based on the following sentence in the Meyer affidavit: "Stan Hartsock was the Manager on Duty and he has admitted to me that he was not truthful at the [ICA] hearing for Michael Naglieri on December 5, 2012." Because Hartsock testified that he was the manager on duty, the actual issue is whether an additional hearing was required based on the phrase in the Meyer affidavit that Hartsock "admitted to me that he was not truthful" at the December 5, 2012 hearing.

¶ 35 At that hearing, Naglieri did not claim that he was surprised by the conflicting testi-

mony summarized by the Majority. At that hearing, Naglieri did not seek leave to introduce additional evidence or testimony from Meyer. Accordingly, the administrative record closed at the conclusion of the hearing. *See* A.A.C. R20–5–159. After the record closed, Naglieri did not seek any relief before the ALJ issued her January 3, 2013 award. Nor does the record reflect any contact between Naglieri and Meyer before the award. Having weighed and assessed the evidence received before the record closed, the ALJ found that Naglieri's "injury did not arise out of the employment and the applicant was not within the course and scope of his employment at the time of the July 18, 2012" injury. Accordingly, the ALJ's award denied Naglieri's claim.

¶ 36 At some point after receiving the January 3, 2013 award and January 21, 2013, Naglieri and/or his attorney apparently had some contact with Meyer, Meyer's affidavit was drafted and Meyer signed the affidavit and had it notarized. A week later, Naglieri moved for an additional hearing. After considering the request and a response, and "having fully reconsidered the file, records and all relevant matters," the ALJ denied the request for an additional hearing and affirmed the award, which she found was "fully supported by the evidence." The Majority concludes that the ALJ lacked the discretion to deny Naglieri's request for an additional hearing and to affirm the award.

¶ 37 In denying Naglieri's request for an additional hearing, the ALJ notes she had "fully reconsidered the file" (which included the Meyer affidavit), "records and all relevant matters." After considering all that information, the ALJ found that the Meyer affidavit did not necessitate an additional hearing and affirmed the award. Such conduct, I submit, does not constitute an abuse of discretion.

¶ 38 The Majority, *see supra* ¶ ¶ 17, 18, states the Meyer affidavit "makes pellucid that the subject of Hartsock's admission of untruthfulness was whether Hartsock was aware that Naglieri was working on his gun when he was injured," meaning the ALJ could not have been unclear about the affidavit's significance. She understood that the only issue in dispute was whether Naglieri or Hartsock was telling the truth about Hartsock's knowledge of the gun, and she would have read the affidavit with that understanding. The 'substance and nature' of the proffered evidence [the Meyer affidavit] was obvious.

I do not share that view of what the Meyer affidavit says and does. However, even if the Majority is correct, the ALJ considered the "obvious" "substance and nature" of the Meyer affidavit, was clear about its significance and still denied the request for an additional hearing and affirmed the award.

¶ 39 A party may seek to introduce additional evidence by stating "specifically and in detail . . . [t]he nature and substance of the additional evidence." A.A.C. R20–5–156(B)(1). The Meyer affidavit does not state "specifically and in detail" what Meyer would testify to about Hartsock's statements to him or, as the Majority states, *see supra* ¶ 29, that Hartsock was "untrue about an issue that determined whether Naglieri's injury was compensable." Instead, the Meyer affidavit states that Hartsock "admitted to me that he was not truthful" at the December 5, 2012 hearing. Nowhere does the Meyer affidavit identify any statement that Hartsock said "was not truthful." Was it a trivial detail? A significant detail? Something in between? Naglieri has the burden to show eligibility for benefits, that his request for an additional hearing should have been granted and, on appeal, that the ALJ abused her discretion in denying that request. *See Keovorabouth v. Indus. Comm'n*, 222 Ariz. 378, 380–81 ¶ 7, 214 P.3d 1019, 1021–22 (App. 2009); *Southwest Nurseries v. Indus. Comm'n*, 133 Ariz. 171, 173, 650 P.2d 473, 475 (App.1982); A.A.C. R20–5–156(B)(1). On this record, the lack of specificity and detail in the Meyer affidavit shows that the ALJ properly exercised her discretion in denying Naglieri's request for an additional hearing. *See* A.A.C. R20–5–156(B).

¶ 40 The Majority, *see supra* ¶ 19, reads the statement in the Meyer affidavit that Hartsock admitted "he was not truthful" about something at the hearing to be a "demonstrat[ion]" that Naglieri had material evidence" that the ALJ "received fraudulent

evidence at the hearing." As applicable here, however, fraud requires, among other things, that a false statement be (1) made about a material issue and (2) knowingly false when made. *See Comerica Bank v. Mahmoodi,* 224 Ariz. 289, 291–92 ¶ 14, 229 P.3d 1031, 1033–34 (App.2010) (noting nine elements of fraud include false material representation and speaker's knowledge of falsity or ignorance of its truth when made) (citing *Marcus v. Fox,* 150 Ariz. 342, 344, 723 P.2d 691, 693 (App.1985)). Given the lack of specificity and detail in the Meyer affidavit, there is no showing that Hartsock's admission that "he was not truthful" was to a material issue or that his "not truthful" statement(s), even if material, were believed to be false at the time he made them.

¶ 41 The Majority, *see supra* ¶ ¶ 20, 25, finds "[t]his case is much like *Southwest Nurseries* " and distinguishes *Mother Tucker's Food Experience v. Industrial Commission,* 142 Ariz. 496, 690 P.2d 797 (App.1984). In my view, this case falls somewhere in between *Southwest Nurseries* (which vacated an award and remanded for an additional hearing) and *Mother Tucker's* (which affirmed an award), but closer to the latter than the former.

¶ 42 In *Southwest Nurseries,* after an ALJ awarded claimant benefits, the carrier and employer filed a request for review, alleging claimant lied about his pre-injury back condition. 133 Ariz. at 173, 650 P.2d at 475. The request for review attached (1) pre-injury medical records showing "extensive medical treatment and hospitalization for prior back injuries" in the same area of the back and (2) an affidavit from counsel stating "that after the scheduled hearing, claimant's girlfriend [who testified consistently with claimant's testimony] had advised him that claimant had lied, and also told him about physicians who had previously treated the claimant for back problems." *Id.* at 172–73, 650 P.2d at 474–75. The ALJ refused to consider the medical records and affidavit and denied the request for review. *Id.* at 173, 650 P.2d at 475. On appeal, in finding an additional hearing should have been held, this court noted "[t]he medical evidence submitted" demonstrated that claimant's testimony was not true and

that "claimant's deceit was therefore related to the very condition for which he claimed benefits, not to some collateral matter." *Id.* Noting "the overwhelming evidence of fraud presented to the" ALJ, "it was a clear abuse of discretion to refuse [the] request." *Id.*

¶ 43 Here, by contrast, there is no showing of a recantation by a testifying witness about material facts (like the girlfriend in *Southwest Nurseries)* and no corroborating documentary evidence to support such a recantation (like the medical records in *Southwest Nurseries).* Similarly, this case does not involve an affidavit stating with precision the statements that were "not truthful" and showing those statements were material (like the girlfriend's statements in *Southwest Nurseries).* Further, unlike *Southwest Nurseries,* where the ALJ *expressly did not* consider the post-hearing evidence, the ALJ in this case *expressly did* reconsider the record (which includes the Meyer affidavit) and then denied the request for an additional hearing. *See Frazier v. Indus. Comm'n,* 145 Ariz. 488, 491, 702 P.2d 717, 720 (1985) (finding *Southwest Nurseries* "inapplicable" where ALJ rejected request for further hearing after considering post-hearing affidavits seeking to offer witnesses to corroborate hearing testimony). Finally, there are no independent objective documents (like the medical records in *Southwest Nurseries)* showing that Hartsock's testimony was not truthful in a material way. Because Naglieri did not show "overwhelming evidence of fraud presented to the" ALJ, *Southwest Nurseries* is a more extreme case than the facts presented here and, accordingly, distinguishable. 133 Ariz. at 173, 650 P.2d at 475.

¶ 44 The facts presented here are closer to *Mother Tucker's.* In that case, this court affirmed the denial of a request for a further hearing based on time cards, discovered after the hearing, showing that the claimant and co-worker witnesses were not on the premises when the injury occurred. 142 Ariz. at 499, 690 P.2d at 800. Applying the *Mother Tucker's* analysis here,

> No witness has confessed perjury. The averments by [Meyer in his affidavit] … simply indicate that [Naglieri] and [his] counsel had found evidence that would

show discrepancies in the testimony of [Hartsock] … who testified on behalf of [employer]. The averment [in Meyer's affidavit] is general and speculative at best and indeed does not really constitute evidence…. It is uncertain what the alleged discrepancy is … and what this ultimately implies.

142 Ariz. at 500, 690 P.2d at 801. Distinguishing *Southwest Nurseries, Mother Tucker's* noted that the "request for further hearing not only does not state 'overwhelming evidence of fraud,' it states no evidence of fraud whatsoever but is merely conclusory and relates to purported impeachment evidence." *Id.* at 501, 690 P.2d at 802. Given that "speculative showing," *Mother Tucker's* found no abuse of discretion. *Id.* at 500, 690 P.2d at 801. Given the vagaries of the single sentence in Meyer's affidavit that Hartsock "admitted to me that he was not truthful" at the hearing, this case is in some significant ways closer to *Mother Tucker's* and does not present the "overwhelming evidence of fraud" found in *Southwest Nurseries.*

¶ 45 It bears repeating that both the Majority and I agree that the ALJ had the discretion to hold an additional hearing and, in the circumstances, perhaps that may have been the better course. But an ALJ choosing between two discretionary alternatives is the cornerstone of what is subject to an abuse of discretion review. And an abuse of discretion review is necessarily deferential. On this record, because the ALJ did not abuse her discretion in denying Naglieri's request for an additional evidentiary hearing, I would affirm, and because I would affirm, I respectfully dissent.